UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
DEC 1 4 2000

SECURITIES AND EXCHANGE
COMMISSION,
450 5th St., N.W.
Washington, D.C. 20649
Plaintiff,

v.

MICHAEL JERRY SAYLOR,
SANJEEV KUMAR BANSAL and
MARK STEVEN LYNCH,

Defendants

___ Civ. ___

COMPLAINT
CASE NUMBER 1:00CV02995
JUDGE: Thomas Penfield Jackson
DECK TYPE: Civil General
DATE STAMP: 12/14/2000

The Plaintiff Securities and Exchange Commission ("Commission"), alleges:

## SUMMARY

1. From the time of its initial public offering in June 1998 through March 2000, MicroStrategy, Inc., a Vienna, Virginia-based software company whose securities are listed on NASDAQ, materially overstated its revenues and earnings contrary to Generally Accepted Accounting Principles ("GAAP"). The company's public financial reports during this time showed a growing software and information services company enjoying positive net income. In fact, as investors later learned, MicroStrategy should have reported net losses from 1997 through the present.

2. The company's restatement reduced revenues over the three-year period by approximately $66 million of the $365 million reported. Approximately $54 million, or 80%, of these restated revenues were in 1999. The company's reporting failures primarily derived from its premature recognition of revenue arising from the



misapplication of Statement of Position 97-2 in connection with multiple element deals in which significant services or future products to be provided by MicroStrategy were not separable from the upfront sale of a license to MicroStrategy's existing software products. Additional restatements resulted from deals in which MicroStrategy had not properly executed contracts in the same fiscal period that revenue was recorded from those deals, as well as other accounting errors.

3.  The incorrect financial results were reported in various periodic reports filed with the Commission and disseminated to the investing public from the fourth quarter of 1998 through year-end 1999, and in registration statements filed in connection with a June 1998 initial public offering and a pending public offering filed in February 2000 that was subsequently withdrawn.

4.  On March 20, 2000, MicroStrategy announced that it intended to restate its financial results for the fiscal years 1998 and 1999. MicroStrategy stock, which had recently reached a high of $333 per share, dropped over 60% of its value in one day, dropping from $260 per share to close at $86 per share on March 20, 2000. The stock price continued to drop in the following weeks. By April 13, 2000, after MicroStrategy announced that it would also restate its fiscal 1997 financial results, the company's stock closed at $33 per share.

5.  Responsibility for the company's financial reports rested with the defendants Mark Steven Lynch, Michael Jerry Saylor, and Sanjeev Kumar Bansal. Lynch, the company's chief financial officer, was principally responsible for ensuring the veracity of MicroStrategy's financial reporting and signed the company's periodic reports. Saylor, the company's founder, controlling shareholder, and top executive officer, signed

the periodic reports and participated in the negotiation of several of the largest restated deals. Bansal, the company's co-founder, participated in the negotiation of several of the restated deals and signed numerous contracts on which revenue was improperly recognized. Saylor, Bansal and Lynch violated Section 17(a) of the Securities Act of 1933 ("Securities Act")[15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act")[15 U.S.C. § 78j(b)], and Rules 10b-5 and 13b2-1 [17 C.F.R. 240. §§ 10b-5, and 13b2-1] thereunder.

## JURISDICTION

6.  This Court has jurisdiction pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

7.  The Commission brings this action seeking a permanent injunction, disgorgement and civil penalties pursuant to Securities Act Sections 20(b) [15 U.S.C. §§ 77t(b)], and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 78u(d) and (e)].

8.  The defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts practices and courses of business alleged herein.

## ISSUER

9.  MicroStrategy, Inc. is a Delaware corporation with principal offices in Fairfax County, Virginia. From its IPO on June 11, 1998 to the present, MicroStrategy's common stock was registered pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 77l(g)] and was quoted on the NASDAQ National Market System.

## THE DEFENDANTS

10. MICHAEL JERRY SAYLOR, age 35, founded MicroStrategy and has been chairman of the board, chief executive officer and president from the company's IPO through the present.

11. SANJEEV KUMAR BANSAL, age 35, was a co-founder of MicroStrategy and has been the company's chief operating officer and a director from the company's IPO through the present.

12. MARK STEVEN LYNCH, age 37, was MicroStrategy's chief financial officer from September 1997 through September 2000 and chief administrative officer from September 2000 through the present.

## STATEMENT OF FACTS

### MicroStrategy's Background

13. MicroStrategy was incorporated in Delaware in November 1989. The company's primary business in the early years consisted of providing software consulting services to help customers build custom software systems to access, analyze and use information contained in large-scale transaction-level databases. During 1994 and 1995, MicroStrategy began focusing its efforts on the development and sale of data-mining and decision support software and related products.

14. By 1996 a majority of MicroStrategy's revenues resulted from software license sales. The company licensed its software through its direct sales force and through value added resellers ("VAR") and original equipment manufacturers ("OEM"). By 1997 sales through VARs and OEMs, sometimes known as "channel partners," accounted for more than 25% of MicroStrategy's total revenues.

15. Since 1996, MicroStrategy's revenues have been derived primarily from three sources: (i) product licenses; (ii) fees for maintenance, technical support and training; and (iii) consulting and development services.

16. In June 1998, MicroStrategy became a reporting public company as a result of its initial public offering of 4.4 million common shares priced at $12 a share. After the offering, Saylor owned approximately 45 million shares, while Bansal owned approximately 10 million shares (post-split numbers).

17. Shortly after going public, MicroStrategy began in the third quarter 1998 to engage in a series of increasingly larger and more complex transactions involving the sale of software as well as extensive software application development and consulting services.

18. By late 1998, MicroStrategy began developing an information network - initially known as Telepath, now known as Strategy.com - supported by the MicroStrategy software platform. The network as conceived would deliver personalized finance, news, weather, traffic, travel and entertainment information to individuals through cell phones, fax machines, e-mails, etc. For a fee, an entity could become a Strategy.com affiliate and offer the Strategy.com channels and services on a co-branded basis directly to their customers and in turn share with MicroStrategy a percentage of the subscription revenues from end-users.

19. During the relevant time period, Strategy.com affiliate deals ranged from the relatively simple purchase of the right to offer customers access to the Strategy.com channels for a flat fee to much more complex transactions involving, in addition to an

affiliation with MicroStrategy, a large scale commitment of consulting and development services to build custom information delivery systems.

## Accounting For Software Sales

20. Generally Accepted Accounting Principles require that revenue from the sale of software be recognized consistent with Statement of Position 97-2. SOP 97-2 contains specific guidance on whether a company may recognize revenue from a software license sale at the time of the sale, or whether the sale must be recognized consistent with contract accounting principles.

21. If an arrangement to deliver software or a software system does not require significant production, modification, or customization, SOP 97-2 specifies that the following four criteria must be met prior to recognizing revenue for a single-element arrangement or for amounts allocated to individual elements of a multiple-element arrangement: (i) persuasive evidence of an arrangement, (ii) delivery has occurred, (iii) vendor's fee is fixed or determinable, and (iv) collectibility is probable.

22. SOP 97-2 further requires that if the software being licensed requires significant production, modification, or customization or any of the above four criteria are not present the company may not recognize revenue from the software or software system at the time of the transaction but instead must apply contract accounting.

23. Where the software transaction contains multiple-elements (i.e., software, upgrades/enhancements and/or consulting services) SOP 97-2 provides guidance concerning when the software license component may be considered a separate element

and thus permit the company to recognize some revenue at the time of the transaction. SOP 97-2 provides that when an arrangement contains multiple-elements, the company must also assess whether the services being sold as part of the arrangement are considered by the customer to be integral to the functionality of the software product license component. If the company determines that the service component of the arrangement is integral to the functionality of the software license component, the company must apply contract accounting.

24.     MicroStrategy's Form 10-K and Annual Report for the fiscal year-end December 31, 1998 and subsequent public filings all stated that "subsequent to December 31, 1997, the Company began recognizing revenue in accordance with SOP 97-2, 'Software Revenue Recognition'." In addition, MicroStrategy's internal revenue recognition policy in effect during the relevant time period stated that the company recognized revenue in accordance with SOP 97-2. MicroStrategy, however, had not complied with SOP 97-2, instead recognizing revenue earlier than allowed under GAAP.

Accounting Errors

*Contract Signing By MicroStrategy*

25.     As is common in the software industry, the majority of MicroStrategy's transactions closed in the final days of the fiscal period. As a result, at the end of a quarter MicroStrategy's contracts department received numerous contracts signed by customers that needed (according to company policy) to be signed by Saylor, Lynch or Bansal.

26.     During the final week of the reporting quarter and the first few days of the following quarter Lynch prepared and updated a report for Saylor and Bansal tracking

MicroStrategy's probable financial results for the reporting period in comparison with Wall Street estimates for the company. During this time period, Saylor, Bansal and Lynch discussed, within a range, the financial results they would like to report in the just-ended quarter and whether to forestall recognizing some revenue.

27.     To maintain maximum flexibility to achieve the desired quarterly financial results, MicroStrategy held, until after the close of the quarter, contracts that had been signed by customers but had not yet been signed by Saylor, Bansal or Lynch. Only after Saylor, Bansal and Lynch discussed the desired financial results were the unsigned contracts apportioned, between the just-ended quarter and the then-current quarter, and signed by either Bansal or Lynch and given an "effective date." In some instances, Bansal and Lynch signed contracts without affixing a date, allowing the company further flexibility to assign a date at a later time.

28.     GAAP and MicroStrategy's own accounting policies required the signature of both MicroStrategy and the customer prior to recognizing revenue. Defendants knew or were reckless in not knowing that the practice of recognizing revenue in a quarter on contracts signed after the close of that quarter was inconsistent with GAAP and with company policy.

*Other Contracts Not Signed by Quarter Close*

29.     In at least three instances, MicroStrategy recognized revenue on transactions that were not completed or signed by either party prior to the close of the quarter. On December 31, 1999, MicroStrategy was engaged in final negotiations with Primark, a Massachusetts based financial, economic and market research information company. Sometime prior to midnight negotiations broke down over an issue that was

not resolved until the following week. Although neither the Primark representative nor Saylor signed the final contract until the week of January 3, 2000, $5 million was recognized by MicroStrategy in its quarter ended December 31, 1999. As discussed below, the Primark transaction was ultimately restated due to a misapplication of the multiple-element transaction requirements of SOP 97-2. Revenue improperly recognized from this contract was material to MicroStrategy's reported financial results for the quarter.

30. Similarly, on September 30, 1999, the last day of MicroStrategy's 1999 third quarter, negotiations with NCR over a $27.5 million transaction continued past midnight. Saylor signed the final contract sometime in the early hours of October 1, 1999. Although Lynch and Saylor both knew that contract had not been signed by the end of the quarter, MicroStrategy recognized $17.5 million in revenue from the transaction in the quarter ended September 30, 1999. As discussed below, the NCR transaction was ultimately restated due to a misapplication of SOP 97-2's provisions regarding the delivery of future products in a multiple-element arrangement. Revenue improperly recognized from this contract was material to MicroStrategy's reported financial results for the quarter.

31. For the quarter ended March 31, 1999, MicroStrategy recognized $956,000 in revenue from a contract with Choicepoint, Inc. On April 5, 1999, the salesperson responsible for Choicepoint advised Saylor, Bansal and Lynch that the contract had been signed by Choicepoint on April 2, 1999 but dated March 31, 1999. Revenue improperly recognized from this contract was material to MicroStrategy's reported financial results for the quarter.

*Accounting for Multiple Element Transactions*

32. After the IPO, MicroStrategy's business moved increasingly away from the straight-forward sale of software toward multi-faceted increasingly complex transactions with extensive service obligations.

33. Generally for accounting purposes, product revenue is recognized immediately, while revenue from services is recognized as the services are provided. Consistent with SOP 97-2, in a transaction with software and service elements, revenue is recognized on the software only if the software sale is separable from the sale of services and only after revenue attributable to the service element is deducted. In a number of the restated transactions, MicroStrategy improperly (i) separated product license sales from service elements, and (ii) characterized revenue in multiple element transactions as product or software revenue and recognized it at the time of the transaction.

34. For example, in the fourth quarter of 1998, MicroStrategy negotiated a $4.5 million transaction with ShopKo to provide software licenses as well as, among other things, extensive consulting and development services and a warrant permitting ShopKo to purchase 50,000 shares of MicroStrategy common stock. The services were, in part, to develop software applications for the MicroStrategy software platform. The overwhelming majority of the software licenses purchased by ShopKo were to be used in conjunction with the to-be-developed applications. Although the product and the service elements were interdependent, MicroStrategy accounted for the software product element as though it were separate from the service and warrant obligations. In addition, MicroStrategy recognized the entire $4.5 million received in the transaction as software product license revenue, allocating no revenue to the extensive service obligations or the

10

warrant. The $4.5 million in revenue improperly recognized was material to MicroStrategy's reported financial results for the quarter.

35.  In the fourth quarter of 1999, MicroStrategy negotiated a multiple element transaction with Exchange Applications which included, among other things, software and extensive consulting and development service elements. The focus of the transaction was the development of "Customer Relationship Management" software and applications leveraging existing MicroStrategy and Exchange Applications software technology. Exchange Applications agreed to pay MicroStrategy $65 million dollars for the: (i) right to resell MicroStrategy's product line as a VAR; (ii) consulting and development services of a dedicated business unit of MicroStrategy employees; and (iii) intellectual property rights to product developed by the dedicated business unit. Again, MicroStrategy improperly separated the software product element of the transaction from the service component and as a result recognized $14.1 million in the fourth quarter of 1999. The $14.1 improperly recognized was material to MicroStrategy's reported financial results for the quarter.

*Strategy.com Transactions*

36.  The Strategy.com transactions combine similar service and software elements and thus presented similar revenue recognition issues as those discussed in the preceding section.

37.  In the fourth quarter of 1998, when the company began to sell the first Strategy.com affiliations, Strategy.com was in the development stage. At the time, only a single preliminary version of a finance channel existed. For the affiliation fee, the affiliate had access to certain MicroStrategy software for the limited purpose of providing

11

access to the Strategy.com network. This software was not delivered to the affiliate, nor did the affiliate have the ability to use the software outside the context of the network. MicroStrategy, in essence, hosted the network. Since there was little initially to host or to offer affiliate subscribers, many of the early Strategy.com transactions had a development component - some required that MicroStrategy develop additional or specialized channels, others required the development of customized applications for the channels. These often involved additional software, licenses and services. MicroStrategy improperly recognized revenue up front on certain Strategy.com transactions by improperly characterizing transactions as the sale of software product.

38.   For example, in the second quarter of 1999, MicroStrategy recognized $6 million in product revenue from a Strategy.com transaction with Ameritrade. As part of the arrangement, MicroStrategy agreed to develop customized systems for Ameritrade to provide certain channels to its customers. Ameritrade also purchased from MicroStrategy the software product licenses necessary in order to eventually provide its customers with access to the to-be-developed applications. Since the service element of the transaction was not separable from the software element, MicroStrategy should have recognized revenue over the term of the contract. Instead, MicroStrategy characterized the entire $6 million received from Ameritrade at the time of the transaction as software product license and recognized it at the time of the transaction. The $6 million in revenue improperly recognized was material to MicroStrategy's reported financial results for the quarter.

39. The same issue arises in several other Strategy.com deals, including Metrocall in the fourth quarter of 1998, and Primark in the fourth quarter of 1999. In each of these transactions, MicroStrategy was obligated to provide services related to the development or delivery of channels. In both cases, MicroStrategy improperly recognized the full contract revenue ($1 million for Metrocall, $5 million for Primark) as product revenue, rather than recognizing the revenue over the term of the agreement.

*Other Accounting Issues*

40. MicroStrategy's financial statements suffered from other revenue recognition problems. For example, MicroStrategy's agreement with NCR included a license to "all current and future generally available software products in MicroStrategy's product line." Because a company cannot provide "Vendor Specific Objective Evidence" of the fair market value for unspecified future products, SOP 97-2 requires the application of contract accounting to arrangements containing unspecified future product obligations. The $17.5 million in revenue improperly recognized from this transaction was material to MicroStrategy's reported financial results for the third quarter of 1999.

41. In the third quarter of 1999, MicroStrategy also recognized $5 million of revenue from a transaction with Sybase in which the two companies essentially swapped $5 million of software. Consistent with GAAP, this transaction should have been accounted for as a barter transaction and would have resulted in no revenue being recognized until such time as the software was used by MicroStrategy internally or was sold to another party. The $5 million in revenue improperly recognized was material to MicroStrategy's reported financial results for the quarter.

42. In the first quarter of 1999, MicroStrategy entered into an arrangement with KMart to provide software licenses, maintenance and services. In connection with the transaction, the sales staff issued a side letter to KMart promising the delivery of future product at no cost. MicroStrategy improperly recognized approximately $2.3 million in revenue that quarter. The revenue was later deferred since the value of the future product could not be determined and the product had yet to be delivered. The $2.3 million in revenue improperly recognized was material to MicroStrategy's reported financial results for the quarter.

### MicroStrategy's Share Price

43. MicroStrategy's June 12, 1998 IPO was priced at $6 per share (adjusting for a January 2000 2 for 1 stock split) and on the first day of trading the shares rose approximately $4.50. During January 1999, MicroStrategy shares traded in a range between $15 and $18 per share. The shares continued to trade in this range through September 1999. During the first week of October 1999, MicroStrategy shares rose to between $30 and $35 per share and by mid-December the shares traded for more than $110 per share. MicroStrategy shares continued to rise, eventually reaching $333 per share on March 10, 2000.

### MicroStrategy's Reported Financial Results and Restatement

44. On March 20, 2000 MicroStrategy announced that it would restate its reported financial results for the fiscal years 1998 and 1999. MicroStrategy thereafter restated its reported financial results for the fiscal years 1997, 1998 and 1999 as follows:

|  | Revenue | | Net Income | |
| --- | --- | --- | --- | --- |
| Reporting period | Original | Restated | Original | Restated |
| | *In thousands* | | | |
| *Year ended:* | | | | |
| December 31, 1997 | 53,557 | 52,551 | 121 | (885) |
| *Quarter ended:* | | | | |
| March 31, 1998 | 19,895 | 19,160 | 542 | (193) |
| June 30, 1998 | 23,790 | 21,138 | 942 | (1,133) |
| September 30, 1998 | 27,014 | 25,960 | 1,928 | 2,055 |
| December 31, 1998 | 35,731 | 29,231 | 2,766 | (2,984) |
| *Year ended:* | | | | |
| December 31, 1998 | 106,430 | 95,489 | 6,178 | (2,255) |
| *Quarter ended:* | | | | |
| March 31, 1999 | 35,784 | 29,322 | 1,859 | (3,804) |
| June 30, 1999 | 45,638 | 40,465 | 3,211 | (3) |
| September 30, 1999 | 54,555 | 35,309 | 3,794 | (12,774) |
| December 31, 1999 | 69,352 | 46,162 | 3,756 | (17,162) |
| *Year ended:* | | | | |
| December 31, 1999 | 205,329 | 151,258 | 12,620 | (33,743) |

### Responsibility of Defendants

45.     Saylor, Bansal and Lynch were each responsible for critical aspects of the company's revenue recognition process, and were responsible for the accuracy of MicroStrategy's financial statements. Each knew or was reckless in not knowing that MicroStrategy's financial statements were materially misleading as result of the accounting practices discussed above.

### Sales by Defendants

46.     In October 1999, Saylor sold 1,000,000 shares (post-split number) of MicroStrategy at between $42.50 and $43 per share (post-split price) for a total of approximately $42.5 million.

15

47. In October 1999, Bansal sold 660,000 shares (post-split number) at between $42.50 and $43 per share (post-split price) for a total of approximately $28 million. On November 19, 1999, Bansal sold 44,000 shares (post-split number) at $47 (post-split price) for a total of approximately $1.8 million.

48. In October 1999, Lynch sold 100,000 shares (post-split number) at between $42.50 and $43 per share (post-split price) for a total of approximately $4.2 million.

## FIRST CLAIM FOR RELIEF

Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)],
Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

49. Paragraphs 1 through 48 are realleged and incorporated herein by reference.

50. Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder proscribe material misstatements or omissions made knowingly or recklessly in a periodic or current report filed with the Commission or otherwise disseminated to investors.

51. By reason of the foregoing, defendants violated Securities Act Section 17(a), Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-1 [240 C.F.R.§§ 13b2-]

52. Paragraphs 1 through 51 are realleged and incorporated herein by reference herein.

53. Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] prohibits any person from, directly or indirectly, falsifying or causing to be falsified, any book, records or account subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

54. Based on the foregoing, the defendants each violated Exchange Act Rule 13b2-1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court enter judgment:

1. against defendant Saylor:

   (i) enjoining him from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5 and 13b2-1 thereunder;

   (ii) ordering him to disgorge unjust enrichment and prejudgment interest thereon, and to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act;

2. against defendant Bansal:

   (i) enjoining him from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5 and 13b2-1 thereunder;

        (ii)    ordering him to disgorge unjust enrichment and prejudgment interest thereon, and to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act;

3.    against defendant Lynch:

        (i)    enjoining him from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5 and 13b2-1 thereunder;

        (ii)    ordering him to disgorge unjust enrichment and prejudgment interest thereon, and to pay civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act; and

4.    grants such other relief as this Court deems just and proper.

_/s/ Phil Shory_
_/s/ Gregory Bruch_

Linda Chatman Thomsen (D.C. Bar 334219)
Gregory S. Bruch (D.C. Bar 413527)
Laura B. Josephs (D.C. Bar 414519)
Gerald T. Balacek
Phil Gross
Eugene H. Bull (D.C. Bar 458648)

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549-0703
(202) 942-4792 (Balacek)

Dated: _December 14, 2000_